## PEOPLE v. JACOBS.

PRISONS — FOOD — DAIRY AND FOOD DEPARTMENT — HOUSE OF CORRECTION.

By an equal division of the court it is *held*, affirming a conviction of the superintendent of the Detroit house of correction for interfering with and preventing an inspector of food of the State dairy and food department from investigating the conditions of said penal institution, that under Act No. 167, Pub. Acts 1899, and § 2156, 1 Comp.

Laws, and § 4978, 2 Comp. Laws, as amended, the dairy and food department is authorized to inspect the house of correction, where a bakery is maintained for the prisoners.

KUHN, STONE, OSTRANDER, and MOORE, JJ., dissenting.

Exceptions before sentence from the recorder's court of the city of Detroit; Connolly, J. Submitted November 5, 1914. (Docket No. 161.) Decided January 4, 1915.

Bernhardt Jacobs was convicted of obstructing an inspector of the dairy and food department in attempting to inspect the house of correction of the city of Detroit. Affirmed.

*Grant Fellows*, Attorney General, and *James W. Helme*, for the people.

*William E. Tarsney* (*Richard I. Lawson*, of counsel), for respondent.

STONE, J. (*dissenting*). This case is before us upon exceptions before sentence. The appellant is the superintendent of the Detroit house of correction, a State penal institution, located in the city of Detroit. On October 21, 1913, Burr B. Lincoln, a State dairy and food inspector, sought to make an investigation of the food conditions in the said institution, and for that purpose he called upon the appellant and requested that he be permitted to go through the building and see the foods that were there served. This request was refused by the appellant, who informed the inspector that he had no right there; that it was an institution over which the dairy and food inspectors had no jurisdiction; and that he could not go through the institution. Because of this refusal, complaint was made charging appellant with a violation of Act No. 167 of the Public Acts of 1899 (2 How. Stat. [2d Ed.] § 3345), being "An act in relation to the powers and

duties of the dairy and food commissioner of the State of Michigan." This act provides that any person who shall obstruct the said commissioner, or his deputy, or any of his duly appointed inspectors, by refusing to allow him entrance to any place where he is authorized to enter in the discharge of his official duty, shall be guilty of a misdemeanor, and prescribes the punishment. A hearing was had upon this complaint in the recorder's court, and the respondent and appellant was by the verdict of a jury found guilty as charged.

The questions raised by the assignments of error may be combined into the one question, namely: Has the dairy and food commission, or its inspectors, power under the law to investigate the food conditions of the Detroit house of correction?

On the part of the people it is contended that ample power is vested in the inspectors of the dairy and food commission to make such investigation, and that, in view of the refusal of the superintendent to permit the making of the investigation, he had violated the act above referred to. Attention is called by the people to chapter 76, 1 Comp. Laws, under the provisions of which said institution was erected, and is controlled, and especially to section 2156 (5 How. Stat. [2d Ed.] § 15462), which provides that:

"The management and direction of the said house of correction, subject to periodical inspection by the State authorities in their discretion, shall be under the control and authority of a board of inspectors, to be appointed for that purpose by the common council of the city of Detroit upon the nomination of the mayor."

It is urged by the prosecution that under this section alone the State has a right to inspect the institution, and that the right of inspection by any State authority is here given; that authority to inspect this institution is made still plainer by the pure food laws

of the State; that section 6 of the act creating the office of dairy and food commissioner and defining his powers and duties (2 Comp. Laws, § 4978, as amended by Act No. 12, Pub. Acts 1905, 2 How. Stat. [2d Ed.] § 3330), states that such commissioner, or his deputy, or any person appointed by him for that purpose—

"Shall have power, in the performance of their duties, to enter into any creamery, factory, store, salesroom, drug store, or laboratory, or place where they have reason to believe food or drink are made, stored, sold or offered for sale and open any cask, tub, jar, bottle or package containing, or supposed to contain, any article of food or drink, and examine or cause to be examined the contents thereof, and take therefrom samples for analysis."

Attention is also called to section 4 of the amendatory act of 1905, which provides that the inspectors shall have the same right of access to the places to be inspected as the said commissioner, or his deputy. A reading of the entire section 6, above referred to, shows that the dairy and food commissioner, his deputy or inspectors, shall regulate filthy and insanitary conditions which may exist in the operation of any bakery or other place where "any food or drink products are manufactured, stored, deposited or sold for any purpose whatever." It was admitted upon the trial of the case that a bakery was maintained in the institution to bake bread for the prisoners, at the time complained of. Section 5029, 2 Comp. Laws (2 How. Stat. [2d Ed.] § 3323), makes it the duty of the dairy and food commissioner of the State to investigate all complaints for violations of the act known as the general pure food law, and especially it is made the duty of the food inspectors in the cities to examine all complaints made to them of violations of the act.

On the part of the defendant and appellant it is

contended that the act creating the State dairy and food commission, and the amendments thereto, together with Act No. 167, Pub. Acts 1899, did not confer the right upon the State dairy and food commission or its inspectors to inspect the food conditions of a public or State institution such as the Detroit house of correction.

It is urged by defendant's counsel that, by the terms of the act creating it, the institution is used for the confinement, punishment, and reformation of criminals, or persons sentenced thereto, under the laws authorizing the cónfinement of convicted persons in the house of correction; that the management and direction of the said house of correction subject to periodical inspection by the State authorities is, by statute, placed under the control and authority of a board of inspectors appointed by the common council of the city of Detroit upon the nomination of the mayor; that this board of inspectors is authorized and empowered by the common council to make rules for the regulation and discipline of the house of correction, and to appoint a superintendent; that under the statute the superintendent has entire control and management of all its concerns subject to the authority established by law, and the rules and regulations adopted for its government.

It is contended by the appellant that the Detroit house of correction is not any one of the places named which the State dairy and food commissioner or his inspectors are authorized to enter; that the institution is not a creamery, factory, store, etc., or a place where the inspectors would have reason to believe food and drink are made, stored, and offered for sale, within the meaning of the statute.

An examination of the statutes relevant to this subject has led us to the conclusion that the public penal institutions of this State, including the Detroit house

184 Mich.—6.

of correction, are not within the purview or terms of the statute relating to the general pure food law. The legislature has provided a visitorial board, whose duty it is to inspect these institutions and make due report thereon. As early as 1871, provision was made for a commission to be appointed, subsequently called the "Board of Corrections and Charities," of which the governor is *ex officio* a member. Section 2252, 1 Comp. Laws (5 How. Stat. [2d Ed.] § 15512), reads as follows:

"The said commissioners, by one of their number, or by their secretary, shall, at least once in each year, visit and examine into the condition of each and every of the city and county poorhouses, county jails, or other places for the detention of criminals or witnesses; and the said board, or a majority thereof, with their secretary, shall, at least once in each year, visit and examine the reform school, State prison, Detroit house of correction, and State and county asylums for the insane, and the deaf, dumb, and blind, and for the purpose of ascertaining the actual condition of the institutions by them or either of them visited, the method of instruction, government, or management therein pursued, the official conduct of the superintendents or other officers and employees in charge thereof, or connected therewith, the condition of the buildings, grounds, or other property thereunto belonging, and the facts as to all other matters in any manner pertaining to the usefulness and proper management of the institutions, poorhouses, and jails above named. They, or either of them, and their secretary, shall have free access thereto at any and all times, and shall have authority to administer oaths and examine any person or persons in any way connected with or having knowledge of the condition, management, and discipline of such institutions, jails, or poorhouses, as to any matters or inquiries not contrary to the purposes or provisions of this act."

Attention is called to the remaining portions of this statute.

An examination of the statutes relating to the gov-

ernment of the State prisons and reformatories, the powers and duties of the boards of control, and of the wardens of the institutions, will show that these officers have plenary power and control over all matters relating to the government of the institutions, including food, medicine, clothing, bedding, etc.—everything which pertains to the health and well-being of the inmates. With these ample provisions, and the added power of visitation lodged in the board of corrections and charities, it does not seem to us that it was the intention of the legislature that this ground was also to be covered by the dairy and food commission. In our opinion that commission has no jurisdiction over these institutions, but its right to inspect is limited to the store, etc., of the manufacturer or vendor of food or drink products, which are made, stored, sold, or offered for sale to the general public.

It will be noted that the language relied upon by the people in the amendatory act of 1905, defining the several places where inspection may be made by the dairy and food commissioner, is specific in designating certain places, to wit, creamery, factory, store, salesroom, drug store, or laboratory, followed by the general words, "or places where they have reason to believe food or drink are made, stored, sold or offered for sale." This general language must be construed as meaning places of the same kind, of the same general character or sort as those named.

Although it appears in this record that the Detroit house of correction bakes its own bread for its inmates, and for that purpose may be said to operate a bakery, yet it does not seem to us that such a place can be covered by any of the specific words mentioned. Certainly it is not a creamery, factory, store, salesroom, drug store, or laboratory, as those words are used in the statute. The general rule should here

apply that when after the enumeration a statute employs some general term to embrace other cases, the other cases must be understood to be cases of the same general character, sort, or kind, with those named. In other words, "They are known from their associates." *Brooks* v. *Cook,* 44 Mich. 617-619 (7 N. W. 216, 38 Am. Rep. 282 and cases cited) ; *Roberts* v. *City of Detroit,* 102 Mich. 64 (60 N. W. 450, 27 L. R. A. 572) ; *Drake* v. *Industrial Works,* 174 Mich. 622 (140 N. W. 933).

We are therefore forced to the conclusion that the Detroit house of correction—a State penal institution, with its superintendent, and its board of inspectors, subject to the visitation of the board of corrections and charities—is not embraced within, and was not intended to be embraced within, the provisions of the pure food law, and that the inspector had no authority to enter the premises. Whenever the legislature desires to clothe the pure food commission with such authority it will doubtless so express itself. We think it has not done so in the past legislation. Reaching this result, that conflict in jurisdiction of the different boards, which would lead to an unseemly contest, is avoided. The conviction should therefore be reversed, and the defendant discharged.

KUHN, OSTRANDER, and MOORE, JJ., concurred with STONE, J.

BROOKE, C. J. My Brother STONE, in the earlier part of his opinion, states very clearly the contentions made on behalf of the people in this case. It is claimed that the dairy and food commissioner, or his deputy, is authorized to make the inspection which was denied, upon two grounds: (1) Under the act creating the Detroit house of correction, section 2 (1 Comp. Laws, § 2156; 5 How. Stat. [2d Ed.] § 15462), which provides:

"The management and direction of the said house of correction, subject to periodical inspection by the State authorities in their discretion, shall be under the control and authority of a board of inspectors, to be appointed for that purpose by the common council of the city of Detroit."

It is claimed on behalf of the people that this language used in the law of its creation is broad enough to warrant the inspection of said institution by any State authority. In my opinion the contention is fully warranted by the language used. It would be difficult to select words of more general import than those used in the statute:

"Subject to periodical inspection by the State authorities in their discretion."

No particular State authority is pointed out, nor is the right of inspection limited to any such particular authority. There is no doubt that included among the State authorities entitled to the right of inspection is the State board of charities. It, however, by no means follows that the exercise of the right by that board exhausts the authority of the State under the language of the section above quoted. It seems to me clear that the labor department might very properly inspect the institution to determine whether proper safety devices were employed as provided by the general laws of the State touching that subject. The State board of health, too, should have authority to inspect and determine whether the laws relating to sanitary conditions were being obeyed therein. And closely akin to the necessity for such inspection is the necessity for inspection by the State dairy and food department in order that it may be determined that the food served is wholesome in quality.

It should be borne in mind that the institution is one of considerable magnitude within the walls of which are confined several hundreds of prisoners, male and female. The female prisoners therein are board-

ed at the expense of the State and many counties of the State having individual contracts with the institution, by the terms of which a per diem amount is paid for the board and medical attendance of each prisoner.

Several industries are carried on in the institution requiring the use of machinery. In my opinion it is an institution peculiarly requiring the supervision of every department of the State whose activities are directed to securing to the inhabitants thereof sanitary conditions, wholesome food, and freedom from danger to life and limb through the use of improperly guarded machinery.

If there could be any doubt of the right of the people to insist that the dairy and food commissioner, or his deputies, is authorized to make the inspection which was denied in the instant case, it is disposed of by a reading of section 6 (2 Comp. Laws, § 4978; 2 How. Stat. [2d Ed.] § 3330) of the law creating that department. That section authorizes the entry of the commissioner, or his deputies, to certain named places and,

"or place where they have reason to believe food or drink are made, sold or offered for sale."

In my opinion it is idle to say that the house of correction is not such a place. Whatever may be said of other penal institutions of the State, this particular institution stores food in large quantities, which it sells. The record shows that during the year it received the very considerable sum of $32,659 for board of prisoners confined therein.

It is, in a sense, in the business of selling food. The fact that its customers happen to be the State itself and several political divisions of the State, makes no difference in the principle involved. It would, I think, scarcely be contended that a hotel keeping, storing, and offering food for sale to its

guests was not subject to the inspection provided for in the act creating the dairy and food department. In any event, I think such a construction of the legislation is too narrow, and I quite agree with the opinion expressed by the learned trial judge who, in refusing to charge as requested by the respondent, said:

"I refuse to give this request to charge, gentlemen of the jury, upon the ground that it is my opinion that the spirit of the dairy and food law is to procure and secure proper food and drink for all of the inhabitants of the State. That is its general purpose and scope. And that the terms of the act creating the dairy and food commission, the acts amendatory thereto, are broad enough to include the Detroit house of correction and all other penal institutions."

The judgment of the court below should be affirmed.

McALVAY, BIRD, and STEERE, JJ., concurred with BROOKE, C. J.